IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
JORGE GEVARA,                      )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    1:09CV343
                                   )
BOYD BENNETT, et al.,              )
                                   )
                Defendants.        )
```

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on a number of motions: 1) Plaintiff's first Motion for an Order Compelling Discovery (Docket Entry 18); 2) Plaintiff's second Motion for an Order Compelling Discovery (Docket Entry 21); 3) Defendants' Motion to Dismiss (Docket Entry 22); 4) Plaintiff's Motion for Order to Compel to Answer and Sanction (Docket Entry 33); and 5) Plaintiff's Second Request for Production of Documents (Docket Entry 34).[1] For the reasons that follow, Defendant's Motion to Dismiss should be granted and Plaintiff's four motions will be denied as moot.

### BACKGROUND

Plaintiff, a prisoner of the State of North Carolina, filed a Complaint against various state prison officials pursuant to 42

---

[1] The Court has no record that Plaintiff filed a "First Request for Production of Documents" in this case. The Clerk's Office administratively terminated Plaintiff's Second Request for Production of Documents as improperly filed (perhaps because it represents a demand for materials from Defendants, rather than for action from the Court). To the extent that said filing could be construed as a request for court action, it is moot.

U.S.C. § 1983. (Docket Entry 2.)[2] Plaintiff utilized a standard form to lodge his Complaint, section III of which is entitled "Exhaustion of Inmate Administrative Remedies." (Id. at 2.) Question A in that section asks: "Did you present the facts of each claim relating to your complaint to the Inmate Grievance Commission or any other available administrative remedy procedure?" (Id.) In answer to this question, Plaintiff checked the space for "No." (Id.) Question C in that section states: "If your answer to A is no, identify the claim(s) and explain why not." (Id.) On the lines that follow, Plaintiff responded: "False charges. I was never told that I could appeal. I was misadvised by the DHO to plead guilty without knowing the accusation and I didn't know that I could appeal disciplinary charges through a grievance." (Id.)[3]

Section V of the Complaint is entitled "Statement of Case." (Id. at 3.) The instructions for that section clearly state: "Number and set forth each separate claim in a separate paragraph." (Id.) Plaintiff did not set out any separately-numbered paragraphs; indeed, he largely did not use paragraphs at all. All of the pre-printed lines on that section of the form (spanning parts of two pages) and most of the first attached extra sheet are

---

[2] In his filings, Plaintiff uses the last name "Galeas" (sometimes followed by the name "Gevara" in parentheses); however, because he is incarcerated under the last name "Gevara," and his claims relate to that incarceration, his case has been docketed under that last name.

[3] Plaintiff's later allegations suggest that "DHO" stands for "Disciplinary Hearing Officer." (See Docket Entry 2 at 7.)

-2-

consumed by one long narrative.  (Id. at 3-4, 6.)  This initial portion of Plaintiff's "Statement of Claim" begins as follows:

"On March 1, 2007 I was taken to punitive segregation in secret without justification by orders of [prison officials] . . . violating my rights without any explanation of my arrest. . . .  I believe that the reason was only because I was intervening in a violation of denial of equal protection or [sic] my race, color, origin, language, accent and religion."  (Id. at 3.)[4]  Plaintiff does not further describe the circumstances under which he allegedly came to be taken to "punitive segregation," but instead describes his prior history of alleging that prison officials:

1) "denied [Plaintiff] and other Hispanic speakers the equal rights of good condition as other inmates with the same opportunities for education and rehabilitation in a language that would be adequately based in [their] disability to understand and comprehend the English language" (id.); and

2) "acted with discrimination to [Hispanic speakers'] language and refusing [sic] to listen to [their] problems that

---

[4] Plaintiff refers to Lanesboro Correctional Institution ("LCI"), but also alleges that the persons who committed the acts in question work at Scotland Correctional Institution ("SCI"). (Docket Entry 2 at 2-3). Defendants' filings confirm that the persons who are alleged to have engaged in the unlawful conduct at issue work at SCI. (Docket Entry 23 at 1.)  At first blush, one might read this portion of the Complaint as alleging that officials at SCI caused Plaintiff to be placed in segregation at LCI on March 1, 2007; however, other parts of Plaintiff's "Statement of Claim" and the description he gives of the persons allegedly involved in those events confirm that Plaintiff remained at SCI during the incidents addressed in this Complaint and was only transferred to LCI at some later point.  (Docket Entry 2 at 5-10.)

-3-

[they] were having with other inmates concerning equal rights of utilities and entertainment" (id.).

Next, Plaintiff asserts that he and other "Hispanic speakers" filed written complaints about these matters and "followed the Administrative Remedy Procedures about this issue but [their] grievances were never answered." (Id.) Prison officials, however, apparently did provide Plaintiff some type of administrative process in response; specifically, Plaintiff references seeking certain witnesses "to be called to the <u>meeting</u> to testified [sic] about the problems that we were having by cause of [sic] the televisions but they refused to call them." (Id. at 3-4 (emphasis added).) He then states: "As a result of this <u>event</u> we were removed from education to punitive segregation in secret without any explanation at all." (Id. at 4 (emphasis added).)

Plaintiff does not offer any more details about this "meeting" or "event" that allegedly ended with his placement in segregation; instead, he simply sets out several lines of conclusory allegations about the culpability of various prison officials for "misconduct." (Id. at 4, 6.) At that point, Plaintiff interrupts his to-that-point unbroken narrative format with two distinguishable (but not separately numbered) paragraphs. (Id. at 6.) The first such paragraph actually consists of one sentence that states: "The complaint above describes due process violations, constituted deliberate indifference and further denial of due process of law in violation under the constitution of rights for failure to perform their job." (Id.) The second such paragraph consists of Plaintiff

-4-

describing what allegedly occurred in the immediate aftermath of his removal to segregation; in this regard, Plaintiff complains that he was separated from "the other Hispanics" and was not given food from approximately 4 p.m. on one day (presumably March 1, 2007) "until the next day." (Id.)

From that juncture, Plaintiff launches into another unbroken narrative that goes on for approximately three and a half pages. (Id. at 6-10.) In that portion of his "Statement of Claim," Plaintiff discusses events that allegedly occurred on March 4, 14, and 21, and April 12, 2007. (Id. at 6, 7, 9.) As to the first of those dates (March 4, 2007), Plaintiff states as follows: "[Two prison officials] came to my cell door and brought me a DC-138A which was a notice to inmate. I [sic] was supposed to be my rights in the inmate disciplinary process." (Id. at 6.) Plaintiff alleges that the prison officials "told [him] to sign [the notice] without reading [his] rights. The notice was already dated 3-02-07, for that reason [he] refused to sign and told [the prison officials] that [he] was suppose [sic] to dated [sic] it and not [them]." (Id.) In Plaintiff's view: "Both of the officers violated [his] rights when they denied [him] the details that are required for disciplinary charges and opportunity to present [his] views to the decision maker, orally or in writing." (Id. at 7.)

Next, Plaintiff turns to events on March 14, 2007, when he alleges that he "was seen by John Doe who was the Head of the F.C.C. just to tell [Plaintiff] that [John Doe] was going to give [Plaintiff] a 45 days extention [sic] to complete [the]

-5-

disciplinary process without explaining to [Plaintiff] anything and without having a hearing yet." (Id.) Plaintiff asserts that this prison official "violated [Plaintiff's] rights for not hearing [Plaintiff's] case which violated [Plaintiff's] right to free speek [sic]. He failed to do his duties because his responsibilities were the Facility Classification Specialists to coordinate classification recommendation." (Id.)[5]

As to the events of March 21, 2007, Plaintiff alleges that he "was seen by John Doe who was the Hearing Officer conducting the disciplinary Hearing." (Id.) Plaintiff's allegations reflect that he pleaded guilty to a disciplinary charge of "assault to staff" before this "Hearing Officer" with another prison official present as a witness. (Id. at 8.) Plaintiff complains that the Hearing Officer: 1) "misadvised" Plaintiff to plead guilty, despite the fact that Plaintiff told the Hearing Officer that Plaintiff knew the cell numbers (but not the names) of witnesses he could call; and 2) "never told [Plaintiff] that [he] had the right to appeal." (Id.) Further, according to Plaintiff, the Hearing Officer "violated [Plaintiff's] rights by not reading [him] the charge or any evidence available in the hearing or statements against [him]. [The Hearing Officer] also violated [Plaintiff's] rights because he failed to review the evidences [sic] and disciplinary case as well

---

[5] Given Plaintiff's use of the term "facility classification specialists" in the same context with his use of the acronym "F.C.C.," it appears he alleges that this "John Doe" was in charge of facility classification.

as to protect [Plaintiff's] rights . . . [including] the opportunity to make a verbal statement." (Id.)

Plaintiff states that, upon returning to his cell, he learned from another inmate the nature of the charge to which he had pleaded guilty and asked to speak with the prison unit manager. (Id.) This unit manager allegedly advised Plaintiff that he "was placed in segregation for made [sic] a riot and for being the head of the Hispanic gang." (Id.) Plaintiff further alleges that the unit manager informed Plaintiff that prison officials "had collected evidences [sic] to support [the] charges and that [the charge to which Plaintiff had pleaded guilty] was the right charge for [Plaintiff]." (Id.) In addition, Plaintiff asserts that the unit manager told Plaintiff that another prison official "had already recommended [Plaintiff] to I-con." (Id.) Plaintiff contends that prison officials violated his rights by failing to give him proper notice that he "was going to be remove [sic] to the I-con block." (Id. at 9.)

Finally, as to April 12, 2007, Plaintiff alleges that "when [he] was already placed in I-con [he] received a paper from [his] new case manager . . . [and] noticed that [he] had another serious charge for which [he] never receive [sic] a 24 hour advance written notice . . ., neither [did he] ha[ve] a hearing . . . ." (Id.)

In the concluding portion of his "Statement of Claim," Plaintiff summarizes his allegations as follows: "None of my rights were protected and all of the staff mentioned in this complaint failed to do their duties violating my constitutional

-7-

rights fabricating false information and reports against me just for being an ex-gang member of the MS. 13 (Mara Salvatrucha) and just for being an inmate and only for being Hispanic." (Id.) According to Plaintiff, not only did the prison staff cited in the "Statement of Claim" commit a constitutional violation, but the prison superintendent and the then-director of the state prison system also were liable for failing to prevent the misconduct and/or to conduct an internal investigation. (Id. at 9-10.)

DISCUSSION

"In response to an ever-growing number of prison-condition lawsuits that were threatening to overwhelm the capacity of the federal judiciary, Congress in 1996 passed the Prison Litigation Reform Act ["PLRA"]." Anderson v. XYZ Correctional Health Servs., Inc., 407 F.3d 674, 676 (4th Cir. 2005). "Of importance to this case is the PLRA's exhaustion-of-remedies requirement." Id. "[T]he PLRA's exhaustion requirement is mandatory." Id. at 677. Moreover, the United States Court of Appeals for the Fourth Circuit has recognized that, in some cases, "a complaint may clearly show that an inmate has not exhausted his administrative remedies." Id. at 682. This case represents just such a circumstance.

As detailed above, Plaintiff has alleged that prison officials violated the Constitution by participating in and/or failing to prevent his wrongful punishment for false disciplinary charges. However, as also documented above, Plaintiff expressly has admitted in his Complaint that he failed to exhaust his administrative remedies as to this matter. Further, again as set out above,

-8-

Plaintiff's own allegations make clear that the prison where these alleged events occurred had an internal administrative grievance process, that Plaintiff was familiar with that process, and that Plaintiff had made use of that process in the time immediately preceding the incident in question.

Under these circumstances, this Court should follow the approach that it and other district courts in the Fourth Circuit have taken in prior such situations and dismiss Plaintiff's action. See Terrell v. Wilson, No. 7:09CV130, 2009 WL 1076295, at *1-2 (W.D. Va. Apr. 21, 2009) (unpublished); Lawson v. Berg, C/A No. 9:07-907-JFA-GCK, 2008 WL 4200328, at *1-3 (D.S.C. Sept. 2, 2008) (unpublished); Moore v. Scotland County Jail, No. 1:05CV527, 2006 WL 2168940, at *1-2 (M.D.N.C. June 28, 2006) (unpublished) (Dixon, M.J.), recommendation adopted, No. 1:05CV527 (M.D.N.C. July 31, 2006) (unpublished) (Beaty, J.).

Plaintiff's "explanation" for his failure to exhaust his administrative remedies does not require a different result. As set out above, Plaintiff explains his inaction as follows: "I was never told that I could appeal. I was misadvised by the DHO to plead guilty without knowing the accusation and I didn't know that I could appeal disciplinary charges through a grievance." (Docket Entry 2 at 2.) This excuse misses the mark.

In this case, Plaintiff has filed an action alleging that prison officials violated his rights by employing inadequate procedures (or inadequately complying with the prison's internal procedures) leading to his wrongful punishment on false

-9-

disciplinary charges.  Prior to launching such litigation in this Court, the PLRA requires Plaintiff to challenge prison officials' alleged misconduct through the prison's internal administrative system (and to exhaust any such process).  As noted above, Plaintiff admits that the prison had such a system and that he had made extensive use of that system for a number of different purposes prior to the events in question.  It is Plaintiff's failure to invoke (and to exhaust) the prison's grievance process to challenge the alleged misconduct of prison officials related to the imposition of discipline upon him, not his failure to administratively appeal the actual discipline imposed, that requires dismissal of this action.

Plaintiff has not alleged that he lacked knowledge of the prison's grievance system (nor, given his admitted prior use of said system, could he plausibly so allege).  Moreover, the allegations in the Complaint (detailed above) reflect that, during the events in question, Plaintiff did not hesitate to ask questions of prison officials.  As a result, if Plaintiff had any uncertainty about what administrative options he had, he surely could (and, based on his allegations, would) have asked.  Moreover, amongst all the many criticisms Plaintiff voices, not once does he allege that he made such an inquiry much less that prison officials refused a request from him for information about the grievance system.

As another district court in the Fourth Circuit recently observed when confronted with analogous circumstances: "Accordingly, the court cannot conclude that the grievance system

was unavailable to Plaintiff on the facts of this case. Plaintiff was advised of and knew about the existence of the system, and he could have asked for any further information he required." Graham v. County of Gloucester, 668 F. Supp. 2d 734, 740 (E.D. Va. 2009).

Further, even if Plaintiff failed to appreciate his entire range of options for pursuing administrative relief via the prison's grievance system, that fact would not excuse his noncompliance with the PLRA's exhaustion requirement. See id. at 741 (citing authority from the Third, Sixth, Seventh, Eighth, and Tenth Circuits in holding that "a prisoner's claim that the grievance system was unavailable to him because he lacked full knowledge of the specifics of the grievance process does not excuse or waive a failure to exhaust administrative remedies"). Any approach that permitted prisoners to bypass administrative review and move directly into federal court simply by alleging lack of knowledge "would be undoubtedly routinely invoked." Id. at 740. In such a context, federal courts would have to evaluate the legitimacy of these regular claims of ignorance from prisoners seeking to avoid exhaustion, "a time-consuming task . . . fraught with uncertainty." Id. To construe the PLRA's exhaustion requirement in a fashion that produced such results would conflict with both the spirit and letter of the PLRA, which "was intended to 'reduce the quantity and improve the quality of prisoner suits'" and which contains no provision authorizing a court "'to excuse compliance with the exhaustion requirement, whether on grounds of futility, inadequacy or any other basis.'" Id. at 739-40 (quoting

-11-

Porter v. Nussle, 534 U.S. 516, 524 (2002), and Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000), respectively).[6]

Although Plaintiff's case could have been dismissed sua sponte without notice to him (given the facial obviousness of his failure to exhaust administrative remedies), see Anderson, 407 F.3d at 682 (authorizing sua sponte dismissal of cases without affording prisoner further opportunity to be heard "where failure to exhaust is apparent from the face of the complaint"), the Court did not do so in this case. To the contrary, this issue has come before the Court upon Defendants' motion after Plaintiff has had a full and fair opportunity to respond. In the face of that privilege, Plaintiff has defaulted by failing to file a proper response. Instead, Plaintiff filed a document that the Court, per Magistrate Judge P. Trevor Sharp, struck as deficient for lack of an identifying caption and a certificate of service. (Docket Entries 30 and 32.) In that order, the Court gave Plaintiff an opportunity to file a corrected response, but, in the more than six months that have passed since that time, he has failed to do so.

Under this Court's practice, because Plaintiff "fail[ed] to file a response within the time required by [this Court's Local

---

[6] Given that Plaintiff knew something about the grievance process and has failed to allege that he tried, but was blocked from learning more, the few cases that recognize some "lack of knowledge" exception to the PLRA's exhaustion requirement would not have application to this case even if the Court found those authorities persuasive in general. See Graham, 668 F. Supp.2d at 741 n.3 (noting that decisions from Eleventh Circuit, Southern District of New York, and Northern District of Illinois "are not all precisely and factually on point with the case at bar wherein Plaintiff had knowledge of the existence of the grievance system, and no evidence suggests that Defendants frustrated any effort by Plaintiff to learn more about the system").

Rules], the motion [from Defendants] will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. R. 7.3(k). Plaintiff's status as a pro se litigant does not entitle him to relief from this rule. "As the United States Supreme Court observed in McNeil v. United States, 508 U.S. 106, 113 (1993), '[the Supreme Court] ha[s] never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.' Accordingly, pro se litigants are not entitled to a general dispensation from the rules of procedure or court-imposed deadlines." Hewitt v. Hutchins, 309 F. Supp. 2d 743, 748-49 (M.D.N.C. 2004) (internal parallel citations and second set of internal quotation marks omitted).

Nonetheless, out of an overabundance of caution, the Court has reviewed Plaintiff's stricken response, including his attachments. That review confirms that, although Plaintiff may have begun some administrative proceedings related to some of the peripheral events outlined in the "Statement of Claim" in his Complaint, Plaintiff has not instigated any grievances as to the primary matters underlying his instant federal claim and he has failed to exhaust his administrative remedies as to any grievances he may have filed.[7] Indeed, in that stricken response, Plaintiff repeats his

---

[7] Plaintiff attached what he contended were copies of three grievances, as well as six letters from North Carolina's Inmate Grievance Resolution Board ("IGRB"). From the former category of items, it appears Plaintiff lodged administrative complaints about only two things, that: 1) on March 4, 2007, two prison officials tried to get him to sign a notice dated March 2, 2007, regarding
(continued...)

admission from his Complaint that he did not exhaust his administrative remedies as to his instant federal claim.[8]

---

[7](...continued)
disciplinary action without reading him his rights; and 2) he was taken to segregation on March 1, 2007, after he and a group of inmates got into a disagreement with and failed to follow the instructions of a prison official during a meeting about their demand for Spanish-language television programming. Although references to these matters appear in Plaintiff's "Statement of Claim," the Court does not find that these grievances capture the bulk or the core of Plaintiff's instant federal claim which focuses on the allegedly unlawful nature of his guilty plea to the assault on staff charge on March 21, 2007, and, to a lesser (and less clear) extent, the additional charge Plaintiff allegedly learned about on April 12, 2007. The Court does not construe Plaintiff's Complaint as stating a separate claim related to the "notice provision" incident on March 4, 2007; nor does the Court find that Plaintiff viably could state such a separate claim given the absence of any authority supporting the view that prison officials violate either federal law or the Constitution if they fail to read a prisoner his "rights" when presenting him with a disciplinary notice. Similarly, the Court finds no basis to conclude that placing the wrong date on a form under the circumstances Plaintiff has alleged would support a cause of action under § 1983. Additionally, the Court does not construe the Complaint to allege a separate claim related to Plaintiff's alleged placement in "segregation" on March 1, 2007; rather, Plaintiff's allegations regarding that matter appear to represent only part of his broader "false charges" claim. To the extent that the Complaint could be interpreted as stating a separate claim in that regard, the Court would find that such a claim could not stand because of its conclusory nature. (See Docket Entry 2 at 3 ("I believe that the reason [I was taken to segregation on March 1, 2007] was only because I was intervening in a violation of denial of equal protection or [sic] my race, color, origin, language, accent and religion.").) The Supreme Court has held such conclusory claims insufficient as a matter of law. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009) (ruling that conclusory allegations that government officials acted "on account of [person's] religion, race, and/or national origin and for no legitimate penological interest" failed to state a claim). As a result, if the Complaint had set out separate claims related to the matters as to which Plaintiff (in a stricken document) indicates he filed grievances, those claims would be subject to dismissal sua sponte under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and/or 1915A(b)(1) (because Plaintiff is proceeding in forma pauperis and/or is a prisoner seeking redress from employees of a governmental entity). Finally, and perhaps most significantly, the final letter from the IGRB attached to the stricken response reflects that Plaintiff still had administrative proceedings open to him on the grievances he did file; accordingly, Plaintiff's own documents confirm his admission that he has not "exhausted" his administrative remedies.

[8] In the stricken filing, rather than blaming lack of knowledge, Plaintiff attributes his failure to exhaust administrative remedies to the fact that prison officials do not do their jobs. That excuse serves him no better than does pleading ignorance. See Graham, 668 F. Supp. 2d at 739 ("[I]n Booth v. Churner,
(continued...)

CONCLUSION

Plaintiff, by his own admission, has failed to exhaust his administrative remedies as to the claim he seeks to litigate in this federal action. The PLRA thus precludes this case from going forward at this time. Given that this case should be dismissed, Plaintiff's other pending motions are moot. Accordingly,

**IT IS THEREFORE RECOMMENDED** that Defendants' Motion to Dismiss (Docket Entry 22) should be GRANTED, but that dismissal should be without prejudice to Plaintiff re-filing his action if and when he exhausts his administrative remedies.

**IT IS FURTHER ORDERED** that, in light of the foregoing Recommendation, Plaintiff's first Motion for an Order Compelling Discovery (Docket Entry 18), second Motion for an Order Compelling Discovery (Docket Entry 21), Motion for Order to Compel to Answer and Sanction (Docket Entry 33), and Second Request for Production of Documents (Docket Entry 34) are all DENIED AS MOOT.

                                           /s/ L. Patrick Auld
                                             **L. Patrick Auld**
                            **United States Magistrate Judge**

April 12, 2010

---

[8](...continued)
532 U.S. 731 (2001), the Court held that exhaustion was required, regardless of whether the system was simple, fast, or effective." (internal parallel citation omitted)); Moore, 2006 WL 2168940, at *1 n.1 ("[T]he Supreme Court has made it clear that 'prisoners must now exhaust all "available" remedies, not just those as in the past that meet federal standards.'" (internal brackets omitted) (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))).